MERCK & CO., Inc., Plaintiff,

v.

CHASE CHEMICAL COMPANY, Arroyo Pharmaceutical Corporation, Sidney Chasman and Randolph Chasman, Defendants.

Civ. A. No. 270–62.

United States District Court
D. New Jersey.

Sept. 1, 1967.

Shanley & Fisher, Newark, N. J., by Frank L. Bate, Newark, N. J., Ward, Haselton, McElhannon, Orme, Brooks & Fitzpatrick, by Joseph M. Fitzpatrick, Charles B. Cannon and Laurence F. Scinto, New York City, of counsel, for plaintiff.

Dughi, Johnstone & O'Dwyer, Westfield, N. J., by Louis J. Dughi, Westfield, N. J., Davis, Hoxie, Faithfull & Hapgood, by John Hoxie and William Kilgannon, New York City, of counsel, for defendants.

## OPINION

AUGELLI, District Judge:

This is an action for infringement of United States Letters Patent No. 2,563,-794 ('794 patent) and No. 2,703,302 ('302 patent). The subject matter is vitamin B–12 and vitamin B–12 active compositions.

Plaintiff Merck & Co., Inc. (Merck) is a New Jersey corporation, having a place of business in Rahway, New Jersey, and is the owner, by assignment, of the '794 and '302 patents.

Defendant Chase Chemical Company (Chase), is a New Jersey corporation, having a place of business in Newark, New Jersey.

Defendants Sidney and Randolph Chasman, are residents of New Jersey, and President and Secretary-Treasurer, respectively, of Chase.

Defendant Arroyo Pharmaceutical Corporation (Arroyo),[1] is a Puerto Rican corporation, having a manufacturing plant in Arroyo, Puerto Rico.

This Court has jurisdiction over the subject matter and of the parties to this action. This is admitted by defendants, as is also the proper laying of venue. 35 U.S.C.A. §§ 271 and 281; 28 U.S.C.A. §§ 1338(a), 1391(c), 1400(b), 2201 and 2202.

The action was tried to the Court on the issues of validity and infringement of the '794 and '302 patents as raised by Merck's original, amended, and supplemental complaints, and defendants' answers thereto, and on defendants' counterclaims for a declaratory judgment of invalidity and non-infringement of the patents. Merck seeks a permanent injunction, an accounting for damages, and an award of treble damages and reasonable attorneys' fees because of the alleged "deliberate and wilful" infringement of the patents by defendants.

The '794 patent, entitled "Vitamin B–12" issued on August 7, 1951, in the names of Edward L. Rickes and Thomas R. Wood, as co-inventors, on an application, Serial No. 108,668, filed August 4, 1949. Said application is stated in the patent to be "a continuation-in-part of our pending applications, Serial No. 20,-356, filed April 10, 1948, now abandoned, and Serial No. 38,175, filed July 10, 1948."

The invention of the '794 patent is said to relate "to the preparation and isolation of a therapeutically valuable substance and more particularly, to the preparation of a substance obtained by the cultivation of suitable strains of the microorganism STREPTOMYCES GRISEUS in suitable culture mediums". It is further stated that the "new chemical compound", which Rickes and Wood named "vitamin B–12", is "capable of promoting the growth of LACTOBACILLUS LACTIS Dorner, and possesses marked and effective action in the therapeutic treatment of Addisonian pernicious anemia[2] and other macrocytic anemias."

The '794 patent contains but one claim, a product claim, which reads as follows:

"The compound vitamin B–12, an organic substance containing cobalt, together with carbon, nitrogen, hydrogen, oxygen, and phosphorous, said compound being a red crystalline substance soluble in water, methyl and ethyl alcohol and phenol, and insoluble in acetone, ether and chloroform, and exhibiting strong absorption maxima at about 2780 $\overset{\circ}{A}$., 3610 $\overset{\circ}{A}$. and 5500 $\overset{\circ}{A}$., and an L.L.D. activity of about 11,-000,000 L.L.D. units per milligram."[3]

---

1. By memorandum decision filed in this action on February 26, 1963, it was determined that Arroyo was completely dominated and controlled by Sidney and Randolph Chasman, and that for the purpose of venue, Arroyo could be considered as having a regular and established place of business in this judicial district.

2. Pernicious anemia was first recognized as a clinical entity in 1849 by Addison. The disease has been defined as "[a] severe, often fatal, form of anemia, characterized by a progressive decrease in the number of red blood corpuscles, and associated with pallor, muscular weakness, shortness of breath, and disturbances of the gastrointestinal and nervous systems." *Webster's New International Dictionary, Unabridged, Second Edition.*

3. The claimed compound was classified as a "vitamin" and called a "B" vitamin because it was soluble in water. It was assigned the number "12" because all prior numbers had been preempted. "B" vitamins differ in chemical composition, structure, and function. Vitamin B-12 is now known as cyanocobalamin, and both terms are used synonymously in the

The '302 patent, entitled "Vitamin B–12 Active Composition and Process of Preparing Same", issued on March 1, 1955, also in the names of Rickes and Wood, as co-inventors, on an application, Serial No. 324,834, filed December 8, 1952. Said application is stated in the patent to be "a continuation-in-part of our co-pending applications Serial No. 38,175, filed July 10, 1948, now abandoned, Serial No. 110,222, filed August 4, 1949, now Patent No. 2,695,862, and Serial No. 146,404, filed February 25, 1950, which applications are, in turn, continuations-in-part of our application Serial No. 20,356, filed April 10, 1948, now abandoned."

The invention of the '302 patent, as set forth therein, "is concerned generally with the production of valuable vitamin products by fermentation. More particularly, it relates to vitamin B–12 active concentrates which possess animal protein factor (APF)[4] activity, and which can be characterized by their property of promoting the growth of the microorganism LACTOBACILLUS LACTIS Dorner (L.L.D.), and to methods for producing such vitamin B–12 active, APF-active and L.L.D.-active materials utilizing selected strains of microorganisms belonging to the subphylum Fungi. These vitamin B–12 active concentrates are valuable as feed supplements and for the treatment of nutritional diseases."

The '302 patent contains 12 claims, but of these only product claims 1, 2 and 3, and process claims 4, 5, 6, 11 and 12 are at issue.

The product claims are practically identical and differ only in the minimal limit of the L.L.D. activity at 440, 1500 and 65,000 L.L.D. units per milligram in each claim, respectively. Product claim 1 is typical and reads as follows:

"1. A vitamin B–12 active composition comprising recovered elaboration products[5] of the fermentation of a vitamin B–12 activity producing strain of Fungi selected from the class consisting of Schizomycetes, Torula, and Eremothecium, the L.L.D. activity of said composition being at least 440 L.L.D. units per milligram and less than 11 million L.L.D. units per milligram."

Of the process claims of the '302 patent in issue, claim 5 is typical and reads as follows:

"5. A process for the production of a vitamin B–12 active composition

Pharmacopeia of the United States. The standard of purity for cyanocobalamin as set forth in that compendium, is not less than 95%, calculated on a dried basis. The references to 2780 Å., 3610 Å. and 5500 Å. in the single claim of the '794 patent relate to Angstrom units, which are used in measuring and expressing the length of light waves. The "L.L.D. activity" mentioned in said claim is a measure of the rate of growth of the microorganism Lactobacillus lactis Dorner. The claimed vitamin B-12 product has an assigned value of about 11 million L.L.D. units per milligram.

4. It had been known for many years that poultry feeds composed primarily of plant materials such as cereal grains, soybean meal, alfalfa, and similar products, were deficient in some factor, characterized as the "animal protein factor" (APF), that was needed to promote the growth of chicks and reduce their mortality. Commercial producers of poultry feeds supplied this essential factor by adding to their feeds substances with known APF activity, such as meat by-products, liver meal, fish meal, fish solubles, and the like. It is to be noted that the '302 patent, inter alia, speaks in terms of the need "to find a more concentrated, standardized, and less expensive source of this important [APF] dietary constituent."

5. As used in the product claims 1, 2 and 3, the term "elaboration products" is said to indicate the composition or "substance that is produced by a microorganism as a result of growth of that microorganism upon some normal footstuff or nutrient material." A "recovered" elaboration product is such a product that is obtained by manipulation carried out by man. It has already been noted that the product claims of the '302 patent all recite that the recovered elaboration products therein mentioned have an L.L.D. activity of "less than 11 million L.L.D. units per milligram", whereas the Vitamin B-12 compound claimed in the '794 patent has an L.L.D. activity of "about 11 million L.L.D. units per milligram."

which comprises fermenting an aqueous nutrient medium under submerged aerated conditions by means of a vitamin B–12 activity producing strain of Fungi selected from the class consisting of Schizomycetes, Torula, and Eremothecium, extracting vitamin B–12 active substances therefrom, and recovering from the resulting extract a vitamin B–12 active composition having an L.L.D. activity of at least 440 units per milligram."

Process claim 4 differs from 5 in defining the process as one for the production of an L.L.D. active composition; process claim 6 differs from 5 in specifically limiting the vitamin B–12 activity producing organism to a strain of Schizomycetes; process claim 11 differs from 5 in reciting the lower limit of L.L.D. activity of the vitamin B–12 active composition produced in accordance with the claimed process as being at least 1500 L.L.D. units per milligram; and process claim 12 differs from 5 in reciting the lower limit of L.L.D. activity as at least 1500 and in limiting the vitamin B–12 activity producing organism recited in said claim to a vitamin B–12 activity producing strain of Schizomycetes.

It may be noted here that in connection with product claim 1, and process claims 4, 5 and 6 of the '302 patent, Merck asserts that the lower limit of 440 L.L.D. units per milligram as recited in said claims, excludes such impractical and low potency fermentation products as may have existed in nature, and that a composition having a vitamin B–12 activity of at least 440 L.L.D. units per milligram, within the language of the claims, is sufficiently potent and concentrated to insure freedom from undesirable or toxic materials.

For a better understanding of the issues involved in this litigation, some recital of the history leading to the issuance of the patents in suit is necessary.

Prior to 1926, medical science could offer very little help to persons afflicted with the disease of pernicious anemia. But in 1926, Doctors Minot and Murphy, of Harvard Medical School, found that pernicious anemia patients were benefitted by the addition to their diets of substantial quantities of the liver of cattle. For this discovery Minot and Murphy received the Nobel Prize. But neither they nor anyone else knew what it was in liver that controlled the disease. The Minot-Murphy discovery spurred efforts by medical and pharmaceutical workers throughout the world to attempt to isolate and identify the factor in liver that was responsible for the beneficial anti-pernicious anemia effect.

The search for the anti-pernicious anemia factor (APAF) in liver was long and tedious. New extracts and concentrates of liver were developed, but they could only be tested by administration to pernicious anemia patients in relapse, and opportunities for such clinical testing were not plentiful. By 1947, however, a number of liver extracts and concentrates were on the market. These preparations reduced substantially the dosage amounts required by patients, but some patients were unable to tolerate them, and they were expensive.

Just what it was in liver that was responsible for the anti-pernicious anemia factor remained a matter of speculation. Some researchers were of the opinion that multiple factors were involved. Others thought the factor was a hormone produced within the body of the animal. Still others believed it might be a vitamin formed in the liver of cattle after slaughter by postmortem autolysis. Tests, however, indicated no relationship between the liver fractions and the then known vitamins. In short, it may be said that there were as many different theories concerning the identity of the beneficial substance in liver as there were investigators.

An indication of the scope and complexity of the problem that confronted the investigators in their efforts to isolate and identify the anti-pernicious factor in liver is disclosed in a joint report published in 1945 by Dr. Subbarow, Research Director of Lederle Laboratories, Dr. Elkin, also of Lederle, and Dr. Hast-

ings of Harvard Medical School. The purpose of this report was to make known "[t]he progress made since 1926 toward the isolation and identification of the anti-pernicious anemia material of liver." These researchers, after an analysis of all the then current learning on the subject, and a consideration by them of the 129 articles cited in their report, could only conclude that:

"It is, unfortunately, apparently not possible at the present time [1945] to reconcile the various claims and facts regarding the material or materials which are present or capable of extraction from liver, and which are therapeutically active in pernicious anemia."

Efforts to isolate and identify the APAF in liver continued. On June 10, 1946, Dr. Thomas R. Wood, one of the patentees named in the '794 and '302 patents, entered the employ of Merck. One of his first assignments was to attempt to isolate the anti-pernicious anemia factor or factors in liver. Earlier attempts by Merck to do this had proved unsuccessful and were abandoned. Dr. Wood worked on various fractionations of liver concentrates, using clinical testing to check the potency of the fractions. However, as previously stated, this type of testing was a slow process, depending as it did on the availability of suitable patients and the time necessarily required to ascertain the results obtained by the liver concentrates in individual cases. The lack of a good assay or test hampered the efforts of investigators to achieve the desired objective. An assay procedure that would expedite the work was needed. Such an assay was developed by Dr. Mary Shorb.

Dr. Shorb was a bacteriologist employed by the United States Department of Agriculture, and later connected with the Department of Poultry Husbandry at the University of Maryland. In 1946, she was conducting experiments designed to develop an assay or test for an unidentified rat growth factor found in liver extracts and other foodstuffs. For this purpose, Dr. Shorb selected the microorganism Lactobacillus lactis Dorner. Using liver products having a determined value in the treatment of pernicious anemia, she noted that the rate of growth of the organism Lactobacillus lactis Dorner (L.L.D. activity), varied in an almost linear relation to the indicated anti-pernicious anemia potencies of the liver extracts she tested. This led Dr. Shorb to speculate that her assay might be useful in liver fractionation work, but of this she could not be certain because it was found that the organism she was testing was also responsive to materials, other than liver, which did not contain any anti-pernicious anemia activity.

In November 1946, Dr. Shorb's work came to Merck's attention. A limited number of liver samples were thereupon sent by Merck to Dr. Shorb at the University of Maryland for assay and a report on the L.L.D. activity of the samples submitted. Thereafter, on February 1, 1947, Merck entered into a contract with the University of Maryland, pursuant to which Dr. Shorb was to continue her efforts to perfect an assay for the antipernicious anemia factor. In furtherance of this program, it was agreed that Dr. Shorb would test, with her assay procedure, for L.L.D. activity, such materials as might be forwarded to her by Merck. For convenience in testing, use was made of an existing liver extract to which was arbitrarily assigned a potency of 1000 L.L.D. units [6] per milligram. This became the standard against which L.L.D. active products were to be measured.

The state of development of Dr. Shorb's assay as of May 1947, is indicated by her statement that "[b]ecause of many variables influencing the growth of L. lactis Dorner, further work is needed in the

---

6. An L.L.D. unit is basically established by measuring the amount of acid produced by the organism Lactobacillus lactis Dorner. In practice this is done by relating the amount of acid produced in a test system with the amount of acid produced in a standard system. Determination of the L.L.D. units is thus made with reference to the standard.

separation of the various factors before accurate assay methods can be worked out. L. lactis Dorner should be of value in the further study of these factors and their relation to anemias." Notwithstanding the need for work "before accurate assay methods can be worked out", Merck admits that the L.L.D. assay, as developed by Dr. Shorb, was a tool of major assistance in the search for the anti-pernicious anemia factor. It was used by Dr. Wood to check the potency of the various liver fractions he was testing, with a considerable saving of time over the slower clinical testings that were dependent upon the availability of pernicious anemia patients. But the record does not support any finding that the Shorb assay pointed to fermentation materials as a source of the anti-pernicious anemia factor.

In addition to the work on liver, Merck also undertook the study of fermentation materials as a possible source of the anti-pernicious anemia factor or factors. In June 1947, Edward L. Rickes, the co-inventor named with Dr. Wood in the '794 and '302 patents, was assigned by Wood to make this study. From that time forward, the research work at Merck proceeded along two lines: (1) the investigation of fermentation materials as a possible source of the anti-pernicious factor, and (2) the isolation and identification of that factor in liver. Wood worked with and supervised the Rickes fermentation investigation while he, Wood, continued his work on liver fractionations.

Rickes experimented with, and performed, extraction operations on a number of materials derived from fermentation sources, samples of which would be

sent to Merck's Microbiology Department for L.L.D. assay. Among the samples was an extract of grisein broth. Grisein was an antibiotic then being made and under study by Merck, but it was never successfully developed as an antibiotic for commercial use. This grisein was produced by a particular strain of Streptomyces griseus, a microorganism that is grown in a nutritional broth under aerobic conditions. Of all the fermentation products tested, grisein was selected as the most suitable for further experimentation.

By September 16, 1947, Rickes and Wood succeeded in recovering from grisein fermentation source materials, compositions having a potency of over 440 L.L.D. units per milligram, the range being from 514 to 1200.[7] These compositions of at least 440 L.L.D. units per milligram are said to come within the terms of claim 1 of the '302 patent. Upon obtaining these results, research was intensified, and included extractions, concentrations, and chromotographic fractionations of grisein materials, in an effort to isolate therefrom the anti-pernicious anemia factor. On October 22, 1947, Rickes noted a pink or reddish color in some of the fractions, the recurrence of which was found to be correlated with the activity of the materials. Samples of grisein concentrates, tested by Merck's nutritional expert, Dr. Ott, who found them to be successful in promoting the growth of chicks.

On December 11–12, 1947, Rickes, for the first time, obtained red crystals from a water solution of a grisein fermentation extract upon the addition of acetone thereto. These red crystals, upon assay, yielded an average reading of 11,000,000

7. These values were obtained from the eluates recovered after elution operations on samples of activated charcoal. Some samples of this activated charcoal had grisein adsorbed thereon. These were called "rich" Norit. Other samples of the activated charcoal from which the adsorbed grisein had been largely removed, were called "spent" Norit. Elutions, with various solvents, were first conducted on the "rich" Norit. The potency of the material eluted by this operation assayed from about 45 to 540 L.L.D. units per milligram. Elutions were then conducted on the "spent" Norit with acetone and ethanol. The material eluted in this manner, and from this source, assayed from 514 to greater than 1200 L.L.D. units per milligram. Merck claims that these were the first activities of 440 L.L.D. units per milligram, or better, recovered from any fermentation product.

L.L.D. units per milligram. This, says Merck, was the first isolation of the anti-pernicious factor, and is the compound described and claimed in the '794 patent. The acetone-water crystallization technique used by Rickes to obtain red crystals from fermentation materials was subsequently found to be successful in extracting the anti-pernicious anemia factor in crystalline form from liver.

In March 1948, the red crystalline material obtained from liver and from fermentation were compared and found to be identical. The crystals from both sources were successfully chick tested, and were also successfully tested clinically on patients suffering with pernicious anemia. Thereafter, on April 10, 1948, the first Rickes and Wood application on vitamin B–12, Serial No. 20,356, was filed.

Consideration will now be given to the issues raised by the pleadings in this case.

Passing for the present the presumption of validity that attaches to patents by virtue of section 282 of the Patent Act of 1952, 35 U.S.C.A. § 282, section 101 of the Act, 35 U.S.C.A. § 101, authorizes the issuance of a patent for "any new and useful * * * composition of matter", provided, of course, that there is a compliance with the other statutory conditions of patentability.

Merck claims that the vitamin B–12 compound of the '794 patent, and the vitamin B–12 active compositions of the '302 patent, are new and useful compositions of matter; that the same can be produced in adequate quantities by fermentation processes under man-controlled conditions, and sold commercially for medicinal and nutritional purposes; that such products were not available prior to their invention by Rickes and Wood; that the products supplied a long-felt need in eliminating the disadvantages of liver extracts in the treatment of pernicious anemia, and also, in the field of animal husbandry, for a dietary growth supplement; and that these products have met with commercial success and acceptance.

Defendants disagree, and they first attack the validity of the '794 and '302 patents on the ground that the patent specifications fail to meet the requirements of 35 U.S.C.A. § 112. That section lays down the rule that a patent specification must disclose the invention in such clear terms "as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same * * *."

One contention made under this section 112 defense is that the patents lack a sufficient description of the strains of organisms used to produce vitamin B–12 or vitamin B–12 active materials in terms of an identifying number for a culture deposited in a culture collection. Defendants argue that this information could have been included in the patent specifications, and that the failure to do so renders the specifications insufficient under the statute. This argument is premised on the assumption that a person skilled in the art would be required "to conduct [his] own screening and fermentation program, including isolation of strains from various sites, and cultivation of the strains under conditions to be developed by the investigator for the particular strain before [he] can attain an organism capable of producing B–12 active material." The evidence does not sustain the position taken by defendants on this phase of the case.

It is, of course, well settled, that a patent is invalid for insufficient disclosure if, in order to practice the invention, a person skilled in the art must resort to elaborate experimentation, independent investigation, or exercise inventive skill. Standard Brands v. National Grain Yeast Corp., 101 F.2d 814 (3 Cir. 1939); Standard Oil Co. of California v. Tide Water Associated Oil Co., 154 F.2d 579 (3 Cir. 1946). But such is not the situation here. The fact that preliminary tests may have to be made will not invalidate a patent for insufficient disclosure when the character and limitations of the tests are well known to the art. The particularity and certainty of disclosure that the law requires in patents is not greater than is reasonable, having regard to their subject mat-

ter. Minerals Separation, Ltd. v. Hyde, 242 U.S. 261, 37 S.Ct. 82, 61 L.Ed. 286 (1916); Locklin v. Switzer Bros. Inc., 299 F.2d 160 (9 Cir. 1961).

Defendants are attempting to equate the specifications of the '794 and '302 patents with the specification that was found to be insufficient in Ex parte Kropp, 143 USPQ 148 (POBA 1959). That case is clearly distinguishable on its facts. The organism used as the starting material in Kropp, which had been isolated from a soil sample obtained in Pennsylvania, could not be reproduced from the written description, nor did the specification give any source where it could be found. Reproduction of the invention (an antibiotic) from the Kropp specification, in the words of the appellate Examiner in Chief,

"* * * would require the initiation of a screening program similar to the screening programs followed in discovering antibiotics in the first instance. Such a program would involve the collection of soil samples from different sources, making cultures from the samples, isolating organisms, reculturing the isolates, and testing the resultant cultures to determine if the particular antibiotic was produced. If the organism involved in the production of the antibiotic were of very common occurrence it might be found in a relatively short time, but if it were not of common occurrence it might not be found for a very long time, if found at all, and if it were a chance variation, the time before it was rediscovered might be extraordinary, or it might even never be found."

It thus becomes apparent why the specification in Kropp was held insufficient. It was pointed out, however, that if Kropp involved "* * * a known organism which had a well defined source and which had been obtained and used by others before, or even with an organism which was merely known and available to persons skilled in the art * * *", the question of the sufficiency of the disclosure would not have arisen.

The specifications in the case at bar deal with known and available organisms. The patents pertain to the arts of chemistry and microbiology, and their specifications are addressed to persons skilled in those sciences.

The '794 patent makes specific reference to a grisein producing strain of Streptomyces griseus suitable for the production of vitamin B–12. There was uncontradicted testimony that as of April 10, 1948, the date on which the first Rickes and Wood application (Serial No. 20,356) on vitamin B–12 was filed, there was available at Rutgers University, in a stock culture collection, a grisein producing strain of Streptomyces griseus; that this organism was suitable for the production of vitamin B–12; that it could be obtained by anyone for experimental or commercial use; and that the identification of that particular strain had been made and published by Rutgers in January 1947. There was also undisputed testimony that the grisein producing strain of Streptomyces griseus was the only strain of that microorganism mentioned in the Rutgers publication; that it was this strain that Merck requested and got from Rutgers; that this same strain has been and still is available, and that anyone requesting it would get what Merck got, namely, a strain of Streptomyces griseus suitable for the production of vitamin B–12.

The '794 specification teaches how the claimed compound of the patent may be obtained by the cultivation of suitable strains of the microorganism Streptomyces griseus in a suitable culture medium. The specification describes, as a starting material, a crude L.L.D. active concentrate of Streptomyces griseus elaboration products, and tells how that concentrate, which produces L.L.D. active ingredients from which vitamin B–12 may be derived, can be prepared. A person skilled in the art would need only to conduct a fermentation of the organism selected and assay the elaboration products for L.L.D. activity. The testimony was uncontradicted that a trained chemist, by following the teachings of the

'794 patent, would be able to produce vitamin B–12, and that the fermentation processes and L.L.D. assays described in said patent are procedures that are well understood and easily performed by those skilled in the art.

In the '302 specification, reference is made to a number of different organisms within the classes Schizomycetes, Torula and Eremothecium which are useful in the production of vitamin B–12 active compositions. The specification gives 13 examples of the use made of a number of these organisms to produce the claimed compositions, suitable nutrients, and different recovery techniques for obtaining vitamin B–12 active compositions. A number of tests are also set forth by means of which the proper strain of organism capable of producing vitamin B–12 active compositions may be selected. Here again, the testimony establishes that a trained microbiologist, by following the teachings of the '302 patent, would be able to produce vitamin B–12 active compositions.

For the reasons stated, the Court is satisfied that the omission to describe the organisms mentioned in the '794 and '302 specifications in terms of identifying numbers in a publicly available culture collection, does not render the specifications insufficient under 35 U.S.C.A. § 112. There is no factual basis to support defendants' contention that this lack of disclosure would require a person skilled in the art to conduct an extensive screening and fermentation development program, tantamount to discovery, before he could attain an organism capable of producing vitamin B–12 materials. The evidence is to the contrary.

Another attack for insufficiency of disclosure under 35 U.S.C.A. § 112, directed to the '794 patent, is that the crystalline fraction, which is the end-product obtained by the '794 recovery procedure, is not pure vitamin B–12, later called cyanocobalamin, but is a complex crystal, in which cyanocobalamin is mixed with other cobalamins. In this connection it is pointed out that the "cobalamin" nomenclature did not exist at the time the

'794 patent was issued. This nomenclature, say defendants, came later, after the molecular structure of the vitamin was elucidated and found to be plural in nature. As a family, the molecules were called "cobalamins", and the most stable of them, the one having a "cyano" group in the molecule was named "cyanocobalamin".

It is contended that it was not until late 1949, after the plural nature of the vitamin was known and the cyano form differentiated, that the distinction between "B–12" and "B–12–like" was made by Merck, at which time the name "vitamin B–12" was confined to the cyano form, and the other cobalamins were called "B–12–like" compounds. Defendants argue that before the plural nature of the material was uncovered, vitamin B–12 meant simply the product obtained by the recovery procedure described in the '794 patent, a mixture of cobalamins, and not the "pure, crystalline cyanocobalamin vitamin B–12", claimed as the patented product. In support of the foregoing, defendants refer, inter alia, to the '302 patent and three other patents owned by Merck: WOLF (2,530,416), issued November 21, 1950; DENKEWALTER (2,678,900), issued May 18, 1954; and KACZKA (2,738,301), issued March 13, 1956.

This argument, which laboriously threads its way through the massive record in this case, is without substance. It takes, as an admitted fact, that a Streptomyces griseus fermentation, such as the '794 patent uses for its starting material, produces in its broth, a mixture of cobalamins. Hence it is argued "as a minimum first proposition", that "there can be no doubt of the possibility that a crystalline fraction recovered from the broth of such fermentation is likewise a mixture of cobalamins." Assuming this to be true, it does not at all follow that such a mixture, when subjected to the '794 recovery procedure, does not yield the claimed compound of that patent.

Examples 7 and 8 of the '302 patent are cited by defendants to show that the crystalline precipitate from a Strepto-

myces griseus broth is a complex crystal, containing both vitamin B–12 and vitamin B–12–like substances. But the fact is, although defendants attempt to minimize it, that the recovery procedure used in the cited examples, differed from the recovery procedure described in the '794 patent.

The Wolf patent relates to procedures for converting vitamin B–12–like substances to vitamin B–12. The patent is cited as being the first disclosure of the existence of several active forms of vitamin B–12 producing compounds, and of the use of cyanamid ions to effect conversion of the vitamin B–12–like substances to pure vitamin B–12. This later-in-time "first disclosure" in no way establishes that the recovery procedure of the '794 patent was incapable of producing pure vitamin B–12. The evidence hereinafter mentioned shows otherwise.

■ The Denkewalter patent covers new and improved procedures for the recovery of vitamin B–12. It describes a fractionation system that may be used either to improve the recovery of the several B–12 active substances as one mixed product, free of inactive impurities, or to selectively recover vitamin B–12 free of the other active substances. The patent is cited to show that concentrates from Streptomyces griseus fermentations are mixtures of B–12 active substances, and also to highlight the difficulties experienced with the '794 style of recovery in the separation of B–12 active substances and associated impurities. Defendants assert that nothing like the Denkewalter fractionation system is described in the '794 patent, and that it is evident that without some such effective further fractionation, the '794 patent yields only a crystalline mixture and not pure cyanocobalamin. Again, the evidence is to the contrary. There is no question that the Denkewalter patent teaches a more efficient recovery method to obtain pure cyanocobalamin. But this later acquired knowledge can have no bearing on the validity of the '794 patent. The sufficiency of the disclosure of the '794 patent must be measured in terms of the specification as of the time it was written and passed upon by the Patent Office.

The Kaczka patent relates to the preparation of a chemically modified form of vitamin B–12, called vitamin B–12a or hydroxocobalamin. This patent is said by defendants to provide the most pertinent evidence in the record concerning the true nature of the product resulting from the '794 recovery procedure, in that said patent shows that a red crystalline precipitate obtained thereby, from a Streptomyces griseus broth, is a mixture of cobalamins in which the cyanocobalamin content can be only about one-half. Attention is also called to the fact that the Kaczka patent discloses a close similarity of the "absorption maxima" curves of B–12 and B–12a, and the need for a special procedure, because of the wide difference in their partition coefficients, to separate the cyano form of cobalamin from the hydroxo form, when both are in a crystalline mixture. Defendants argue that the intelligence imparted by the Kaczka patent is proof that the '794 recovery procedure will not produce pure cyanocobalamin. But again, the proof is to the contrary.

In sum then, defendants argue that viewed in light of the disclosures of these later dated Merck patents, and other evidence in the case, it is clear that the '794 patent does not teach a fractionation procedure by which to recover pure cyanocobalamin, free of other B–12 active compounds; that such procedure, at best produces a mixture of cobalamins, with whatever inactive materials come with it; and that in order to obtain pure cyanocobalamin, resort must be had to purification steps not taught in the '794 specification. The evidence is practically uncontradicted that by following the teachings of either the first Rickes and Wood application, Serial No. 20,356, filed April 10, 1948, or the '794 patent, a person skilled in the art, a trained chemist, would produce pure crystalline vitamin B–12, the claimed compound, now known as cyanocobalamin.

In the '794 patent, a number of distinguishing characteristics of vitamin B–12 are set forth, including the wavelengths and absorption intensities of the compound and its partition coefficient in toluene, ortho-cresol and water, and water/benzl alcohol systems. The patent teaches that when a crystalline product or a high degree of purification is wanted, "[t]he crystals may be redissolved in water and precipitated with acetone several times to remove any impurities that may still remain." Developments at different stages of the recovery procedure are noted so that the trained chemist would know whether or not the operation is progressing satisfactorily, and would also be able to determine that the end-product obtained was pure cyanocobalamin and not hydroxo or other forms of cobalamin.

Dr. Earl Pierson, a chemist employed by Merck, and the holder of degrees in organic chemistry, testified that the '794 patent disclosed pure crystalline vitamin B–12, now known as cyanocobalamin, and that the '356 application filed April 10, 1948, likewise made a similar disclosure. Dr. Pierson further testified that a skilled chemist, following example 2 of said application, would obtain cyanocobalamin of 90–95% purity; also, that there was teaching in the '356 application that would enable the skilled chemist to improve the purity of the cyanocobalamin so obtained, if necessary; and that the purity of cyanocobalamin obtained by one crystallization could be improved by re-crystallization, a technique that was well known and in common use in 1947.

Edward L. Rickes, one of the co-inventors named in the '794 patent, testified that in January 1948, he produced a batch of crystals, designated as sample 481–30A, in accordance with example 2 of the patent, which is practically identical with the same numbered example in the '356 application. He did not use any "countercurrent distribution" [8] procedure on the crystals. This same sample, 481–30A, was tested in February 1948, by Merck's research chemist, Dr. Donald E. Wolf. He ran a countercurrent distribution on the crystals and found them to be 98–99% pure cyanocobalamin.

The sufficiency of the disclosures of the '794 and '302 patents passed muster in the United States Patent Office. While this, of course, is not binding on this Court, it is a factor to be considered in light of the expertise and competence that the trained personnel of the Patent Office bring to bear on problems involved in matters of this kind. Moreover, and more importantly, the Court is satisfied, upon a consideration of the evidence in this case, that the '794 and '302 patents fully satisfy the requirements of 35 U.S.C.A. § 112. See Guaranty Trust Co. of New York v. Union Solvents Corp., 54 F.2d 400 (D.Del.1931), aff'd 61 F.2d 1041 (3 Cir. 1932).

What has already been said also disposes of the argument directed to the alleged insufficiency of the 1948 applications mentioned in the '794 and '302 patents. These are the so-called "parent" applications, Serial No. 20,356 filed April 10, 1948 and Serial No. 38,175 filed July 10, 1948. Defendants contend that the failure to set forth in said applications a sufficient description of the organisms suitable for the production of vitamin B–12 and vitamin B–12 active compositions, and the failure to sufficiently describe the claimed subject matter of the patents, render the applications fatally defective, under 35 U.S.C.A. § 120, as a proper basis upon which said patents may rely for their effective filing dates.

The lack of sufficient descriptions of the organisms centers around the omis-

---

8. A countercurrent distribution procedure may be employed to determine purity or to purify impure materials. One of the charges levelled against the '794 patent is that said patent does not describe a countercurrent distribution or other purification procedure. However, such would seem to be unnecessary in light of the quality of the crystals produced by Rickes without the use of a countercurrent distribution, and confirmation of the purity of the crystals by the use of that procedure by Dr. Wolf.

sion to describe or refer to any publicly available culture collections in which strains of the organisms mentioned in the applications may be found or from which they may be obtained. But as mentioned earlier in this opinion, the organisms named in the applications and in the patents are well known organisms to persons skilled in the art, and available. Defendants have not shown the fact to be otherwise.

As to lack of sufficient description in the applications of the claimed subject matter of the patents, the argument here is a repetition of that advanced in connection with the alleged insufficiency of disclosure of the patent specifications. For reasons already stated, there is no merit to this contention. The evidence clearly establishes that a person skilled in the art, whether reference is had to the applications or the patents, will be able, by following the teachings therein set forth, to produce the claimed compound of the '794 patent and the claimed compositions of the '302 patent.

■ It follows, and the Court so finds, that the applications for the '794 and '302 patents were valid continuations-in-part of the '356 and '175 applications, and that the patents are entitled to their filing dates of April 10 and July 10, 1948. See General Talking Pictures Corp. v. Western Electric Co., 304 U.S. 175, 183, 58 S.Ct. 849, 82 L.Ed. 1273 (1938); Clark Blade & Razor Co. v. Gillette Safety Razor Co., 194 F. 421, 422 (3 Cir. 1912).

The validity of the '794 patent is also attacked on the ground that it creates an excessive and unlawful monopoly. It is contended that the patentees did not invent the claimed compound, vitamin B-12, but merely recovered it, from an existing material containing it, in a more nearly pure condition than it had been in before. Defendants further contend that the patented product represents, not a newly created compound, but only a purified form of the anti-pernicious anemia factor (APAF) that had existed and was known to be present in liver, and that such being the case, the product

monopoly asserted by Merck under the '794 patent, cannot legally be sustained. In other words, the compound claimed in the patent is not "new" since it existed before in the parent material, and it is not "inventive", as a product, because the concept of it was obvious. 35 U.S. C.A. §§ 101 and 103.

In support of these contentions, defendants point to the work on liver done by a number of investigators, including Laland and Klem in Norway; Strandell in Sweden; Emery, Parker, Hurran and Smith in England; and Murphy in this country. Reference is also made to the commercial liver extracts of Lederle Laboratories, Inc. and Eli Lilly and Company.

The work of Laland and Klem (1936), and Laland (1939), were cited to show that these scientists had effected a 200,-000-fold concentration of the anti-pernicious anemia factor in liver, and that their product had some of the characteristics of vitamin B-12. But there is no indication that these men knew what it was in liver that controlled pernicious anemia, or that they had any understanding as to the chemical nature of whatever that something might be. The most refined liver fractions obtained by Laland and Klem were bright reddish-yellow or light orange-red in color, as contrasted with the red crystals of vitamin B-12. There was also a difference in chemical composition. An analysis of the Laland-Klem liver fractions showed the presence of carbon, nitrogen, hydrogen, and sulphur. Vitamin B-12 contains all of these elements except sulphur, plus phosphorus, cobalt and oxygen. The absorption maxima of the Laland-Klem fractions also differed from those of vitamin B-12, thus creating doubt as to whether the absorption observed in connection with the Laland-Klem material was due to the active [anti-pernicious] principle in the liver or to a contamination. And finally, Laland and Klem never obtained their substances in crystalline form.

Strandell's paper (1935), merely reported on a number of cases treated by the author with a new liver preparation

called Pernami. Mention is made by Dr. Strandell that he had collaborated with Laland and Klem in experiments looking toward the isolation of "the anti-anemic principle of the liver", and he expressed the hope that this isolation would be accomplished in the near future.

The work of Emery, Parker and Hurran appears to have been primarily concerned with the problem of standardization of liver extracts and not with the isolation or identification of the anti-pernicious anemia factor or factors in liver. The Emery and Parker report (1946), which makes reference to an earlier paper (1945) by Emery and Hurran, was cited to show that a further purification of the anti-pernicious anemia factor in liver had been achieved. This further purification yielded a fraction of 1.2 milligrams from 1 kilogram of liver, and was said to have proved active in human pernicious anemia on a single dose of 1 milligram. As to this fraction, however, the report stated that it had been dried from the frozen state and was shown not to have any specific ultra-violet absorption characteristics.

Regarding the liver work done by Smith, suffice it to say that it was not until April 24, 1948, which was eight days after Merck's publication of its isolation of the anti-pernicious anemia factor from liver, that Smith wrote an article stating that he had prepared, from ox liver, two red pigments, both highly active in pernicious anemia. Defendants call attention to the fact that the Smith product, although not crystalline, was nevertheless "credited" by Merck as being an "isolation" of the anti-pernicious anemia factor. This statement is based on a note appearing in one of defendants' exhibits. That note hardly supports the conclusion that Merck "credited" Smith's purification of the liver fractions as an "isolation" of the anti-pernicious anemia factor. In any event, nothing like the Merck crystals eventuated from the Smith experiment.

Dr. Murphy's article, "Anemia in Practice", published in 1939, contains an interesting history of the development of liver therapy in the treatment of pernicious anemia. The article describes the difficulties encountered in attempting to serve a sufficient quantity of liver in such a way as to be most effective and palatable for a patient who had an inherent dislike for it. Dr. Murphy then traces the development of liver extracts for peroral use for those patients who found it difficult to ingest whole liver. He then tells of the emergence of the highly concentrated and potent liver extracts that were suitable for parenteral administration.

There can be no question but that following the Murphy-Minot discovery of whole liver therapy in 1926, much progress was made in the refinement, purification, and preparation, for commercial use, of liver extracts, which reduced substantially the dosage requirements for patients afflicted with pernicious anemia. These commercial liver extracts were available in 1947, and for some years prior thereto.

However, as pointed out by Dr. Murphy in his 1939 article, the liver extracts that were prepared for parenteral administration, both in this country and abroad, varied greatly in concentration and potency, thus making it difficult to describe the dose and method of use of the available preparations. Dr. Murphy's experience was largely limited to the Lederle extracts, which were found by him to be of a high standard of potency. But it is to be noted that there were pernicious anemia patients who, when treated with the commercial liver extracts, experienced unfavorable reactions, ranging from mild to severe, including "weakness, increased pulse rate and perspiration, drop in systolic pressure, pruritis, or urticaria." Shock, and even death, sometimes occurred.

In evidence in this case is a study made by Dr. Noren of Sweden in 1948, on the allergic reactions in parenteral liver therapy and vitamin B–12. Involved were 130 pernicious anemia patients, later reduced to 124, who were receiving parenteral liver treatments. Out of the reduced number, 18 were found to exhibit

allergic reactions to liver. It was noted that in some cases the symptoms were quite severe, while in others the allergic reaction so increased in intensity, that parenteral liver therapy had to be abandoned. Dr. Noren then tested 9 of the more serious cases with crystallized vitamin B–12, and found a complete absence of adverse reactions, thus demonstrating that those pernicious anemia patients who could not tolerate the liver therapy, could now be helped by vitamin B–12.

■ Defendants agree that Merck's crystalline product, vitamin B–12, as claimed in the '794 patent, is more nearly pure, "by a substantial margin", than the most potent earlier concentrates of the anti-pernicious anemia factor in liver. Other advantages of the patented product over the earlier liver extracts are also admitted. But, say defendants, repeating the arguments already made, these advantages do not give rise to patentability because, in the best view of the matter, the patented product is not a newly created compound, but only a purified form of the anti-pernicious anemia factor in liver, the existence and efficacy of which, to cure anemias, has been known since 1926. Defendants have cited a number of cases which enunciate the generally recognized principles that a patent may not be awarded for a product of nature, or for a substance that is merely extracted from its parent material and purified, or for a new form of an old product. Illustrative are Ex parte Sparhawk, 64 USPQ 339; Ex parte Snell, 86 USPQ 496; Ex parte Cavallito, 89 USPQ 449; Ex parte Reed and Gunsalus, 135 USPQ 34; Ex parte Hartop, 139 USPQ 525; In re King, 107 F.2d 618, 27 CCPA 754; Application of Fisher, 307 F.2d 948, 50 CCPA 1025; General Electric Co. v. De Forest Radio Co., 28 F.2d 641 (3 Cir. 1928).

De Forest is a good example of a typical "product of nature" case. It involved the Coolidge patent for "tungsten and a method of making the same for use as filaments of incandescent electric lamps and for other purposes." It appears that tungsten in its natural state as found in the earth is brittle. What Coolidge did was to invent a process to purify the natural product. Tungsten in this state, he discovered, had the characteristics of ductility and high tensile strength. The broadest product claim in the Coolidge patent was for "[s]ubstantially pure tungsten having ductility and high tensile strength." As against the patentee's assertion that he created "substantially pure tungsten", the court held he did not because the product existed in nature. As to the additional words of the claim, "having ductility and high tensile strength", the court said this was merely descriptive of the subject matter. In brief, the court found that Coolidge neither created pure tungsten, nor its characteristics. Both qualities, said the court, were created by nature. The validity of the patent was thus limited to the method Coolidge disclosed for converting the natural product into purer form.

It is interesting to note, as did the court in De Forest, that Coolidge did not seek a patent for "a new composition of matter", but instead claimed as the subject matter of his patent, a product which, upon reference to the patent specification, was found to be the "tungsten of nature". It is also interesting to note that the state of the art, long before Coolidge, disclosed the use of tungsten as a filament for an incandescent lamp, and also how to make a wire of tungsten.

There can be no quarrel with the holdings in De Forest and other cases cited by defendants, but they are not controlling here. Each case must be decided upon its own facts. Incidentally, no assertion is made on this branch of the case that Merck's patented composition was anticipated under 35 U.S.C.A. § 102. The date of the invention here is December 11–12, 1947, and it is clear that no single prior art patent or publication disclosed the vitamin B–12 compound claimed by the '794 patent. See Dewey & Almy Chemical Co. v. Mimex Co., 124 F.2d 986, 989 (2 Cir. 1942). Patentability rests, then, upon a determination of whether the '794 patent covers a "new and useful

\* \* \* composition of matter", and, if so, whether the disclosures of the prior art, notwithstanding lack of anticipation, nonetheless negative patentability because of obviousness. The record in this case fully supports patentability when viewed in light of utility, novelty and non-obviousness of the subject matter. See in this connection the following cases: Kuehmsted v. Farbenfabriken of Elberfeld Co., 179 F. 701 (7 Cir. 1910); Union Carbide Co. v. American Carbide Co., 181 F. 104 (2 Cir. 1910); Parke-Davis & Co. v. H. K. Mulford Co., 189 F. 95 and 196 F. 496 (2 Cir. 1912); Smith, Kline & French Laboratories v. Clark & Clark, D.C., 62 F.Supp. 971, aff'd 157 F.2d 725 (3 Cir. 1946); Union Carbide & Carbon Corp. v. Stuart Laboratories, 194 F.2d 823 (3 Cir. 1952); Bristol Laboratories v. Schenley Laboratories, 117 F.Supp. 67 (S.D.Ind.1953); Charles Pfizer & Co. v. Barry-Martin Pharmaceuticals, 241 F.Supp. 191 (S.D.Fla. 1965).

It cannot be seriously disputed, on this record, that the claimed compound of the '794 patent constitutes a new and useful composition of matter. It certainly was not disclosed or even suggested in or by the prior art. The prior art was liver-oriented. All efforts to isolate and identify the anti-pernicious anemia factor were directed to liver sources. The factor continued to remain unidentified and unknown. The '794 patent, of course, does not deal with liver.[9] The claimed subject matter, pure cyanocobalamin or vitamin B–12, is a red crystalline substance derived from a fermentation source. The record amply supports the conclusion that the idea to investigate fermentation materials as a possible source of the anti-pernicious anemia factor originated with the patentees, Rickes and Wood, and that it was not suggested to them by anyone else.

Before Rickes and Wood made it available to the world, pure crystalline vitamin B–12, as described and claimed

in the '794 patent, did not exist. No one had produced even a comparable product. The new product had such advantages over the earlier liver extracts that it not only replaced them, but became, and remains to this day, the universal treatment for pernicious anemia. The new product has completely eliminated the harmful side effects of the old liver preparations. Moreover, crystallization of the claimed compound was significant in that it established for the first time that the anti-pernicious anemia factor could be obtained in crystal form, susceptible to any desired degree of purification, and also to physical and structural determination. It also made possible standardization, by weight, of the exact dosage required by patients.

Further evidence of the utility of the '794 invention from a medical standpoint may be found in defendants' own advertising brochure enclosed with each of their vitamin B–12 products, wherein it is stated, inter alia, that:

"Vitamin B–12 is probably the most potent hematopoietic substance known. Since it is identical with the anti-anemia factor in liver, it is fully as effective as liver injection USP. It provides prompt and favorable response in the treatment of primary pernicious anemia. \* \* \*

No known toxic effects for oral or parenteral administered Vitamin B–12 have been reported. No chronic or cumulative toxic effects have been observed even with massive doses. There are no known contraindications. Although a very few reactions have been noted, evidence indicates that it is particularly useful in the treatment of patients sensitive to pork or beef liver extracts."

In a similar vein, it was brought out on cross-examination of defendants' witness, Harry J. Konen, that in a talk given by him at a nutritional conference, he stated that he regarded the isolation by Merck

9. It has already been noted that red crystals, identical with those obtained from fermentation on December 11–12, 1947, were also obtained from liver, by Merck personnel, about one week later.

of the anti-pernicious anemia principle, and the research work relative thereto, as one of the most important developments in the field of nutrition from the standpoint of both basic science and scope of application, whether commercially in the feed industry or in human nutrition.

■ The state of the prior art, as reflected by this record, does not support defendants' argument that the subject matter of the '794 patent was obvious. The proofs point in the direction of non-obviousness. No one, before Rickes and Wood, succeeded in isolating and identifying the anti-pernicious anemia factor that had theretofore been associated only with liver. The chemical nature of that factor was unknown and was the subject of many theories and speculations. No one, other than Rickes and Wood, conceived the idea that fermentation materials might be a source of the anti-pernicious anemia factor. This Court is satisfied that the patentees of the '794 patent have given to the world, for the first time, a medicine that can be used successfully in treating all patients suffering with pernicious anemia, a medicine that is subject to accurate standardization, and avoids the unfavorable reactions of the earlier liver extracts. It did not exist in nature in the form in which the patentees produced it, and nothing in the prior art either suggested or anticipated it.

■ In considering the question of obviousness under 35 U.S.C.A. § 103, the prior art must be viewed from the point in time just prior to when the invention was made. Many things may seem obvious after they have been made, hence courts must guard against the use of hindsight. See Diamond Rubber Co. of New York v. Consolidated Tire Co., 220 U.S. 428, 435, 31 S.Ct. 444, 55 L.Ed. 527 (1911); Craft-Stone, Inc. v. Zenitherm Co., 22 F.2d 401, 402 (3 Cir. 1927); Marvel Specialty Company v. Bell Hosiery Mills, Inc., 330 F.2d 164, 172 (4 Cir. 1964); Monroe Auto Equipment Co. v. Heckethorn Mnfg. & Sup. Co., 332 F.2d 406, 412 (6 Cir. 1964). The difficulty of determining subjectively at some removed time whether a particular invention would have been obvious to a person of ordinary skill in the art, invites a consideration of objective criteria of obviousness. See Reiner v. I. Leon Co., 285 F.2d 501 (2 Cir. 1960). As was stated by Mr. Justice Clark in Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1965):

"Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy."

■ In the case at bar, the '794 patented product met with great commercial success and acceptance. While these factors alone do not give rise to patentability, if none in fact exists, yet it is permissible to take them into consideration on the issue of obviousness or nonobviousness. A Merck witness testified that the first sale of crystalline vitamin B–12 by Merck was made in 1949, and consisted of 7 grams of that product, each gram of which was sold for $12,500.00. All 7 grams were purchased by Merck competitors, including 2 grams by Eli Lilly & Company. Sales of Merck products using crystalline vitamin B–12 cyanocobalamin, of U.S.P. purity, for the years 1948 through 1964, amounted to $79,575,000.00. It is apparent that vitamin B–12 fulfilled a long felt need for a medicine of great benefit to mankind, a medicine that could now be produced in adequate quantities by fermentation processes under man controlled conditions. It follows, and the Court so finds, that the single claim of the '794 patent is valid in all respects. Defendants have

failed by "convincing evidence" to overcome the presumption of validity to which the patent is entitled under 35 U.S.C.A. § 282. See Moon v. Cabot Shops, Inc., 270 F.2d 539 (9 Cir. 1959); King-Seeley Thermos Co. v. Tastee Freeze Industries, 357 F.2d 875, 879 (7 Cir. 1966).

The three product claims of the '302 patent were involved in earlier litigation. In Merck & Co. v. Olin Mathieson Chemical Corp., 152 F.Supp. 690 (W.D.Va. 1957), the District Court found the claims to be invalid as (1) covering a "product of nature", and (2) for "lack of invention". On appeal this decision was reversed. The Court of Appeals, in 253 F.2d 156 (4 Cir. 1958) found the claims to be valid, stating: " * * * we think the invention is meritorious, the product claims of the patent valid and entitled to a liberal construction." The case was then remanded for further proceedings consistent with the opinion filed by the appellate court. Thereafter, the defendant petitioned the Court of Appeals for a rehearing on the ground that "[t]he defense of double patenting [as against the '794 patent], pleaded and proved in the District Court, was not passed upon below * * *." The rehearing was denied, but the court amended its earlier decree "to permit appropriate consideration by the said District Court of any defense except the defense of lack of invention considered and discussed in the opinion of this Court." In the retrial of the case on remand, the defendant urged the defenses of "double patenting", "excessive monopoly", and "non-infringement". Before a decision was reached on these issues, the case was settled by the taking of a license by the defendant, and the entry of a consent decree.

■■■■■ Defendants, in the instant case, gloss over the record in Olin Mathieson, and insist that "new evidence", and "new connecting evidence", of "crucial force", that was not before the courts in the earlier case, establishes the invalidity of the '302 patent. It is said that on such different evidence as is claimed to be here present, there would be no lack of comity in coming to a con-

clusion contrary to that reached by the Court of Appeals in Olin Mathieson. That decision is, of course, entitled to great weight on the matters thereby decided, but it has no binding force here. This Court is under a duty to make an independent study of the record in this case and arrive at an independent judgment on the merits. See Standard Brands v. National Grain Yeast Corp., 101 F.2d 814 (3 Cir. 1939). Such a study and determination, in light of the alleged "new evidence", has been made, and for the reasons hereinafter stated, this Court concludes that the product claims of the '302 patent are valid.

The '302 patent, as has already been noted, is directed to vitamin B–12 active compositions derived from the fermentation of selected microorganisms. As was stated by the Court of Appeals in Olin Mathieson, the product claims of this patent " * * * do not reach pure, crystalline vitamin B–12 [the '794 product], for they are restricted to compositions having a maximum LLD activity which is less than that of the pure substance. The claims do not cover vitamin B–12 compositions derived from liver or any source other than the specified fermentates. Nor do the claims extend to compositions of such low activity as to be of no commercial or therapeutic value. They do cover B–12 active compositions derived from the specified fermentates, which, beyond question, are of very great therapeutic and commercial importance. They are cheaply and abundantly produced and all toxic and harmful substances eliminated without the necessity of isolating crystalline vitamin B–12."

The contention made by defendants that the '302 patent is invalid because Merck is not entitled, under 35 U.S.C.A. § 120, to invoke the effective filing dates of the 1948 "parent" applications of April 10 and July 10, 1948, heretofore considered also with respect to the '794 patent, has been considered and decided adversely to defendants. The present attacks against the validity of the '302 patent are: (1) lack of novelty over the pri-

or art because of the known existence of earlier concentrates of B–12 active material, of fermentation origin, having APF or APAF activity; (2) obviousness of resorting to a fermentation-recovery procedure as a means of obtaining B–12 active compositions from such earlier concentrates, as exemplified by a number of episodes; (3) "late claiming"; and (4) "double patenting".

In order to more fully understand the foregoing arguments (1) and (2), the work of investigators in the field of animal husbandry must be considered. Reference has already been made in footnote 4 of this opinion to the need that developed to find a suitable substitute for the unknown factor in poultry feeds that hens required for growth, egg hatchability, and viability of the chicks hatched. Research in that field indicated the presence of some substances in cow manure, dried cow rumen contents, fish meal, whey, liver meal, alfalfa, residues from alcohol fermentations, distiller's solubles, hen feces, and the like, that stimulated the growth of chicks. But there was no single identification of the substance or substances in these so-called chick growth factors that was responsible for their growth promoting properties. To this day, many of these growth factors remain unknown. Others, like the cow manure and chicken feces factors were never isolated in any identifiable form. It is also to be noted that the substances which provided the animal protein factor (APF) in poultry feeds, were in relative short supply and expensive, adding considerably to the cost of poultry raising. Moreover, these substances were open to the objection that they contained comparatively small and varying amounts of the APF. And, of course, none of this material was used for treating human anemias. This is to be contrasted with the more concentrated, standardized, and less expensive source of the vitamin B–12 active compositions of the '302 patent, which have proved of value not only as animal feed supplements, but also as being useful in the treatment of nutritional diseases.

It will be recalled that the invention date of the '302 patent is September 11–16, 1947. It was then, for the first time, that recovery from a fermentation source, of vitamin B–12 active compositions, having more than 440 LLD units per milligram, was obtained. Dr. Woodruff testified, and it was not disputed, that a composition having a potency above 440 units per milligram, is free from any undesirable toxic material and is capable of successfully treating disease, promoting growth, and enhancing the well-being of animals and humans. But defendants point to the prior publications on the liver extracts. As to these, defendants call attention to the fact that prior to September 16, 1947, it was publicly known that liver extracts were B–12 active compositions, and of fermentation origin. They hazard a guess that if the Shorb assay had then been available, the B–12 active compositions of liver extracts would have shown LLD values comparable to those of the '302 product claims. The gist of the argument here is that these extracts were in the public domain before 1947, and that regardless of the origin and past history of the B–12 active content of said liver extracts, the product claims of the '302 patent represent nothing more than a new way of producing an old product; hence, patentability is lacking.

What has been said about the liver extracts in connection with the '794 patent is equally applicable in the case of the less pure products of the '302 patent. The '302 patented compositions are not "old products". As was stated by the Court of Appeals in Olin Mathieson, at pp. 162, 163 of 253 F.2d:

"Until the patentees produced them, there were no such B–12 active compositions. No one had produced even a comparable product. The active substance was unidentified and unknown. The new product, not just the method, had such advantageous characteristics as to replace the liver products. What was produced was, in no sense, an old product."

Except for some testimony by Dr. Rubin, Dr. Green, and Mr. Konen, defendants' case, in the main, rested on a mass of documentary evidence, including a large number of prior art publications and patents, plus certain depositions that had been taken in Olin Mathieson, and in another case in this District, Merck & Co., Inc. v. Anheuser-Busch, Inc., Civil Action No. 441–57. This latter case, following the pattern of Olin Mathieson, was settled by the defendant therein taking a license, and the eventual entry of a consent decree which recognized the statutory validity of the '302 patent. No useful purpose will be served by a detailed analysis of the mass of material put in evidence by defendants. All of it has been examined by the Court, and reference will be made only to those parts deemed relevant.

In addition to the work done on liver extracts, defendants also stress the pre-1947 experiments conducted by a number of investigators who were interested in finding a suitable animal protein factor (APF) for poultry feeds, to take the place of high quality protein supplements of animal origin. As previously mentioned, substances containing the APF were in short supply and expensive. Dr. Hammond, one of the early investigators, found that dried cow manure and dried rumen contents, contained a chick growth factor activity of animal protein. Two other scientists, Dr. Rubin and Dr. Bird, followed through on this work and prepared more concentrated extracts of cow manure. In an article published by Dr. Bird in "The Yearbook of Agriculture", on June 18, 1947, the author stated " * * * that the growth-promoting effect of cow manure was due to an unknown factor in it, not to the presence of any known vitamin, and * * * that this mysterious factor is synthesized in the digestive tract of mature chickens and is present in their excrement in about the same concentration as in cow manure. Hence, the rumen is not essential to its synthesis."

This leads to a consideration of hen feces as an alternative natural material having the same chick growth activity as an animal protein such as the cow manure extract. In late 1946, Dr. McGinnis conducted a fermentation of hen feces which to him demonstrated that the chick growth activity was produced by incubation of the droppings after they were voided, and not materially in the chicken's intestines, as supposed by Bird and Rubin. The record also cites certain episodes, in which groups interested in producing a feed supplement having APF activity, resorted to fermentation and recovery to do so, thus confirming, say defendants, the obviousness of doing that on the basis of what was known before September 16, 1947, the invention date of the '302 patent. In a word, the argument is, that prior to that date, liver extracts, cow manure extracts, and hen feces extracts, were concentrates of vitamin B–12, produced by bacterial fermentation, and that the isolation thereof by a fermentation-recovery procedure was obvious in light of what was then known.

But what was done by the investigators in this field is a far cry from that which was accomplished by the patentees in this case. In no sense do the mentioned extracts approach the established superiority of the patented compositions of the '302 patent. As found in the "natural fermentates" of liver, cow manure, and hen feces, the APF activity contained therein had no utility, therapeutically or commercially. It appears from Dr. Rubin's testimony that in his work with Dr. Bird, no consideration whatsoever was given to the use of their products for therapeutic purposes. Moreover, Dr. Rubin testified that he was not able to isolate from the materials used, either the "* * * cow manure factor or the hen feces factor". He further stated that neither of these were sold as animal feed supplements, and postulated that "* * * it would be very difficult to accomplish [this] unless it was [authorized] by an act of Congress." And Dr. Bird, a co-worker with Dr. Rubin, in a published article dated June 18, 1947, stated that " * * * the use of cow manure as a source of vitamins is not yet

advised by the Department [of Agriculture], pending further research. We must know more about the possibility of spreading disease."

Not much time need be spent on the so-called "McGinnis-Lewis", "Lederle", "LeMense", and "Schenley (deBecze)" episodes.

It was not until Dr. McGinnis met Dr. Lewis on December 18, 1947, that discussions took place concerning the "possibilities" of finding microorganisms to synthesize the unidentified chick growth factor in hen feces. And it was not until January 22, 1948, that these gentlemen began testing fermentation products for the presence of that unidentified chick growth factor. These dates, of course, are subsequent to the invention dates of the '794 and '302 patents, and it was not until long after the April 16, 1948 publications by Merck announcing the discovery of vitamin B–12, that McGinnis, Lewis, and others, filed their application which resulted in the issuance of Patent No. 2,576,932 for a "Fermentation Process for Production of Vitamin B–12".

As to the "Lederle" episode, it appears that on September 19, 1947, Drs. Jukes, Petty and Stokstad, initiated a project to study the possible production of the "animal protein factor" by means of fermentation. There is no indication that these researchers were interested at the time with the isolation or identification of the anti-pernicious anemia factor. See the Subbarow report mentioned earlier in this opinion. The object of these Lederle men was to extract " * * * various micro-organisms from chicken and cow manure to be used in the fermentation", and that the " * * * microorganisms would be used in the fermentation for production of the animal protein factor." These investigations, as well as an article by Dr. Stokstad and others, entitled "Activity of Microbial Animal Protein Factor Concentrates in Pernicious Anemia", and Patent No. 2,-515,135, on "Animal Nutrition", issued to Dr. Petty on July 11, 1950, on an application filed June 8, 1945, were all later in point of time to the invention date of the '302 patent (September 11–16, 1947) and subsequent to the Merck announcement of its discovery of vitamin B–12 on April 16, 1948. The Stokstad article mentions two Lederle concentrates that were used successfully on pernicious anemia patients. However, there is no evidence as to when these concentrates were used, nor was there a finding that the animal growth factor in liver and bacterial substances were identical with the " * * * classic antipernicious factor". Moreover, the authors of the Stokstad article could not decide whether their substance was identical with the APAF or " * * * the recently isolated vitamin B–12 shown to be active in pernicious anemia * * *."

The "LeMense" episode is based on an application filed by Elmer H. LeMense on April 7, 1948, for a patent covering ingredients for poultry and animal feeds. A second application filed December 4, 1951, resulted in the issuance on March 13, 1956, of a patent for "Producing a Growth Promoting Factor". The invention related to ingredients for poultry and animal feeds and to a process for preparing such ingredients. Defendants cite this patent as a disclosure of a process for making an APF active product by fermentation and recovery, using certain strains of microorganisms. LeMense's first application was directed only to an "unidentified" chick growth factor and made no mention of pernicious anemia or anti-pericious anemia products. It was not until December 4, 1951, long after the Merck announcements and sale of vitamin B–12, that LeMense filed his second application which resulted in the issuance of Patent No. 2,738,274, in which reference is made to vitamin B–12.

The "Schenley" episode involved principally the work of Dr. deBecze and Mr. Konen. Dr. deBecze did not testify as a witness for defendants at the trial, but his voluminous depositions and many related exhibits were made part of the record. In his deposition, Dr. deBecze, Manager of Research and Distillery Control for Schenley Distillers, Inc., testi-

fied concerning his work during the period 1945–1949 covering the fermentation enrichment of distillery wastes for use as animal feed supplements. This work, which he referred to as a "3N Soludri" process, resulted in two deBecze patents [10] now owned by defendants. Before trial, defendants singled out the deBecze patents, and deBecze himself made actual tests to demonstrate and reproduce a typical process and product made in accordance with the teachings of said patents. Defendants arranged for Dr. deBecze to run a typical fermentation process test in accordance with Example 5 of one of his patents, No. 2,636,823. This test took several days to run and counsel for both sides were present during the latter part of the test.

The test procedures were supervised by defendants, who also selected the organisms used by Dr. deBecze. Samples of the deBecze tests were submitted to an independent testing organization of defendants' own choosing, with the request that said testing organization run vitamin B–12 assays on the samples submitted. The result of these tests were not offered in evidence by defendants, but the Court, on Merck's offer, and over defendants' objections, permitted them to become part of the record. An analysis of the reports of the tests, and the uncontradicted testimony of Dr. Woodruff, indicated that the vitamin B–12 activity of the deBecze material was less than 1.7 LLD units per milligram, and useless in light of the LLD content of the product claims of the '302 patent.

Harry Konen, a Schenley employee during the 1945–1947 period (and whose testimony regarding the value of Merck's isolation of the anti-pernicious anemia factor in liver has already been mentioned in this opinion), was the person responsible for evaluating the deBecze work "* * * from the standpoint of feeding value", which was done "* * * through the use of chicks and white rats." The results of Konen's evaluation of the deBecze process was not conclusive, and was challenged in another contemporary Schenley report dated February 5, 1947. Konen testified that he was never successful in isolating the deBecze factor, which, in the deBecze patent (No. 2,636,823), was stated to be "* * * of an as yet unidentified nature * * *". In any event, sometime in 1947, Schenley disbanded the entire deBecze research program in animal feed supplements and never marketed any of the deBecze material. Subsequently, Schenley purchased its requirements of B–12 active products from Merck.

Upon a consideration of the full record in this case, including that alleged not to have been before the court in Olin Mathieson, this Court concludes, and so finds, that the product claims of the '302 patent are in all respects valid. This patent, as does the '794 patent, enjoys the statutory presumption of validity which defendants have been unable to overcome. Also, that which has been said with respect to hindsight on the issue of obviousness in regard to the '794 patent applies here with equal force. And on the question of commercial success and acceptance as factors bearing on patentability, the record shows sales running into the millions of dollars, the total dollar sales volume of Merck's vitamin B–12 and vitamin B–12 active compositions, in the years 1948 through 1964, amounting to $121,727,000.00.

The evidence in this case fully supports the conclusion reached by the Court of

---

10. These patents are No. 2,636,823, issued April 28, 1953 on an application, Serial No. 785,187, filed November 10, 1947; and No. 2,626,868, issued January 27, 1953, on an application filed June 16, 1948, which was a continuation-in-part of application '187. The invention of the '823 patent "* * * relates to the production of certain growth factors or growth materials, by treating aqueous nutrient media with micro-organisms which primarily comprise the bacteria of the colon-Aerobacter group of the Tribe-Eschericheae." The invention of the '868 patent "* * * relates to the production of certain growth factors or growth materials, by treating aqueous nutrient media with various micro-organisms."

Appeals in Olin Mathieson (253 F.2d) at page 164, that:

> "The compositions of the patent ['302] here have all of the novelty and utility required by the Act for patentability. They never existed before; there was nothing comparable to them. If we regard them as a purification of the active principle in natural fermentates, the natural fermentates are quite useless, while the patented compositions are of great medicinal and commercial value. The step from complete uselessness to great and perfected utility is a long one. That step is no mere advance in the degree of purity of a known product. From the natural fermentates, which, for this purpose, were wholly useless and were not known to contain the desired activity in even the slightest degree, products of great therapeutic and commercial worth have been developed. The new products are not the same as the old, but new and useful compositions entitled to the protection of the patent."

See the previously cited cases of Smith, Kline & French Laboratories v. Clark & Clark, 157 F.2d 725, 729 (3 Cir. 1946); Kuehmsted v. Farbenfabriken of Elberfeld Co., 179 F. 701 (7 Cir. 1910). And Cf. American Wood Paper Company v. Fibre Disintegrating Company, 23 Wall. 566, 90 U.S. 566, 23 L.Ed. 31 (1874); Cochrane v. Badische Anilin & Soda Fabrik, 111 U.S. 293, 4 S.Ct. 455, 28 L. Ed. 433 (1883).

The '302 patent is also alleged to be invalid for the reason that its broad claims were belatedly presented in December, 1952, after others had made the subject publicly known and had it in production and on sale. The short answer to this is found in the sufficiency of the "parent" applications of April 10 and July 10, 1948. Defendants cite the case of Muncie Gear Works, Inc. v. Outboard Marine and Mnfg. Co., 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171 (1942). That case is predicated on the requirements of 35 U.S.C.A. § 102. Another case, Schriber-Schroth Co. v. Cleveland Trust Co., 305 U.S. 47, 59 S.Ct. 8, 83 L.Ed. 34 (1938), is based on lack of compliance with the disclosure provisions of 35 U.S. C.A. § 112. These cases are distinguishable. The evidence in the case at bar fully supports the sufficiency of the 1948 "parent" applications under the cited sections of the Act, hence there is no basis to support the "late claiming" charge.

Defendants' "double patenting" defense has no merit. It is elementary that one invention can only support one patent. See Miller v. Eagle Manufacturing Company, 151 U.S. 186, 14 S.Ct. 310, 38 L.Ed. 121 (1894). The main objections to double patenting are obvious: (1) possible extension of the patent monopoly which would occur if two patents for the same invention did not expire at the same time; and (2) possible double harassment of infringers. The argument here is that the claims of the '302 and '794 patents present no difference in substance and are of the same scope. This contention is tied in with another patent, No. 2,703,303,[11] also issued to Rickes and Wood. Ignoring the '303 patent for the moment, and considering defendants' claim of substantial identity of subject matter of the '302 and '794 patents, it is clear from this record that the challenged patents are not invalid for double patenting. The '794 patent is for a pure crystalline substance, cyanocobalamin having specified characteristics, and possessing great therapeutic value for the treatment of pernicious anemia. The less pure product claims are directed to vitamin B–12 active compositions com-

11. The '303 patent was issued to Rickes and Wood March 1, 1955, on an application filed on February 25, 1950, as continuations-in-part of the "parent" 1948 applications filed on April 10 and July 10, 1948. The invention of the '303 patent was for the production of L.L.D. active substances by streptomyces, and contained 9 process claims for the production of L.L.D. active substances and vitamin B–12 active compositions, relating principally to the animal protein factor (APF) concentrates for use as feed supplements.

prising elaboration products recovered from the fermentation of selected groups of microorganisms having potencies between the stated limits of the claims, which are valuable for animal feed supplements and for the treatment of nutritional diseases. There is a substantial difference in the inventions covered by the patents in question, a complete lack of identity, which makes the defense of double patenting inapplicable. See Jacquard Knitting Machine Co. v. Ordinance Gauge Co., 213 F.2d 503, 507 (3 Cir. 1954); and Cf. Plax Corporation v. Precision Extruders, 239 F.2d 792, 796 (3 Cir. 1957); Pierce v. Allen B. Du Mont Laboratories, Inc., 297 F.2d 323 (3 Cir. 1961). As in the case of the '794 patent, the Court finds that the product claims of the '302 patent are in all respects valid.

Some of the arguments advanced by defendants against the validity of the product claims of the '302 patent, are apparently also intended to prove the invalidity of the process claims of said patent here in issue, namely, process claims 4, 5, 6, 11 and 12. The Court has so considered the arguments, and finds that the process claims of the '302 patent are invalid, whether considered from the viewpoint of the prior art or on the basis of obviousness. The invalidity of a process claim does not, of course, affect the validity of a product claim that per se, meets the statutory tests of patentability. See Benger Laboratories, Limited v. R. K. Laros Company, 209 F.Supp. 639, aff'd 317 F.2d 455 (3 Cir. 1963); Application of Larsen, 292 F.2d 531, 49 CC PA 711 (1961).

Benger involved a number of product and process claims relating to a therapeutic preparation for the treatment of iron deficiency anemia. The validity of the product claims was upheld, while the process claims were rejected. Representative of the product claims was one which read as follows:

"A composition comprising a substantially monionic complex of ferric hydroxide with a dextran having an average intrinsic viscosity at 25°C. of

about 0.025 to about 0.25, said complex being stable in contact with water."

A typical process claim related to:

"The process of preparing a substantially non-ionic collodial ferric hydroxide-dextran complex which comprises combining, in contact with water, a dextran having an average intrinsic viscosity at 25°C. of about 0.025 to about 0.25 with ferric hydroxide, said ferric hydroxide being formed in situ in contact with the dextran by a double decomposition reaction between an ionizable ferric salt and an alkali base."

It is interesting to compare the similarity in principle between the product and process claims in Benger, with those contained in the '302 patent. Among the defenses asserted in Benger, many of which are also present in the case at bar, was one contending the Benger claims invalid as lacking in invention in view of the prior art. As to this contention the court said, at page 643 of 209 F.Supp.:

"To appreciate the reason why the process is an obvious one while the product is not, one must have clearly in mind the objective of the invention claimed respectively in the process and product claims. The process claims do not even suggest anything of a therapeutic nature. The desired end result of the process was simply the production of a stabilized ferric hydroxide solution. That the admittedly old steps of the process would result in obtaining such a solution if dextran were the carbohydrate used could not but have been obvious to a skilled worker in the field, but that is all that was obvious. What was not obvious was that the solution produced would be intramuscularly injectable, and the discovery that it would have this unexpected and unpredictable property qualifies it as patentable. In other words, all that the process was aimed at was the creation of a certain composition of matter and, that having been accomplished by an obvious method, the fact that the finished product had a new and unex-

92

pected property does not make the process patentable."

The court in Benger, cited with approval, the principle enunciated in Larsen, supra, a case also involving a therapeutic compound. In Larsen, the court said "* * * it is clear * * * that the allowance (by the Patent Office) of the claims to the compounds was based on the fact that they possessed unique, and presumably unexpected properties. * * * Under these circumstances, however, the inventive concept is that of the compounds themselves. When they have been conceived, the processes by which they may be prepared may or may not be obvious. If, as is the case here, such processes, given the idea of the compound, are obvious then it is apparent that the invention resides in the compounds per se and is not properly defined as a process."

In principle, the quoted language appears to be particularly appropriate when considered in relation to the '302 process claims. The product claims of the patent deal both with a product and source thereof unknown to the prior art. But the process claims all speak in terms of "fermentation", "extraction", and "recovery", all of which are manipulations known to and practiced by the trained chemist or microbiologist. The fermenting of an aqueous nutrient medium under submerged aerated conditions is nothing new. The fact that some known and available organisms require oxygen for growth (aerobic) while others (anaerobic) do not, is also known to the person skilled in the art. And the same is true with regard to the various temperatures, pressures, and acid levels of the fermenting material, as well as the nutrient medium used to promote growth of the selected organism. What is involved here is not "invention", but rather technical knowledge that does not rise above ordinary steps of chemical experimentation. The "recovery" steps of the patent do not describe any new or unobvious manipulations. Elutions, chromatographics, fractionations, and extractions, are all steps and procedures known to the skill-

ed person, and used by him when attempting to solve a specific problem. The prior art in this case, considered as a whole satisfies the Court that the process claims of the '302 patent are not inventive in the sense of the patent law. See the 1935 work of Dakin and West in the Subbarow Report, and the 1939 work of Laland and Klem. The discovery by the patentees of a new product and source of same, is rewarded by the 3 product claims of the '302 patent. Because the Court has found the '302 process claims of the patent invalid, defendants' claim of double patenting as against the '303 patent need not be considered.

It remains to consider whether defendants' products infringe the single product claim of the '794 patent and the three product claims of the '302 patent. The burden of proving infringement rests upon the party asserting it. See General Chemical Co. v. Selden Co., 60 F.2d 144 (W.D.Pa.1932). The determination of the problem in this case is simplified because defendants agree that the acts that are charged to infringe are "admitted" as acts done, and that there would be infringement by the acts accused, in relation to the several products accused, "if the patents [are] valid in the broad literal scope of their claims." The Court finds that the product claims of the '794 and '302 patents are commensurate with the scope of the inventions disclosed thereby, and that the accused products do infringe the product claims of both patents.

The evidence clearly established that defendants' crystalline products, as exemplified by exhibits P–28, P–29, P–30 and P–31, embodied each and every element and feature of the '794 product claim. For example, the chemical analysis showed the same elements in both; the '794 compound is a red crystalline substance, so is that of defendants; the '794 product is soluble in water, methyl and ethyl alcohol and phenol; ditto, as to defendants' products; both are insoluble in acetone, ether and chloroform; both exhibit strong absorption maxima of the same range; and the L.L.D. activity of

the '794 product of "about 11,000,000 L. L.D. units per milligram", was matched by comparable figures ranging from 10,-300,000 to 11,500,000 L.L.D. units per milligram in the accused products. These vitamin B–12 crystals produced by defendants are capable of being dissolved in liquid form, as evidenced by exhibit P–54, and of again being converted into crystal form without having any effect on their therapeutic value. Any claim of non-infringement based on suspension or temporary dissolution in a liquid solution is of no avail to defendants. The accused product is the same, bearing the label "Vitamin B–12 Cyanocobalamin Injection USP". The change in form, in the manner indicated, does not avoid infringement. See Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950); Smith v. Snow, 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721 (1935); Tilghmam v. Proctor, 102 U.S. 707, 26 L.Ed. 279 (1881); Flintkote Co. v. National Asbestos Mfg. Co., 52 F.2d 719 (3 Cir. 1931); Parke-Davis & Co. v. H. K. Mulford Co., 189 F. 95 (C.C.1911).

Just as the evidence and exhibits P–28, P–29, P–30 and P–31, established infringement of the single product claim of the '794 patent, so, too, in relation to the product claims of the '302 patent, the evidence and exhibits P–32, P–33 and P–34, established infringement of the '302 claims. P–33 and P–34, the so-called "feed grade" materials, and P–32, the "liquid concentrate", were all shown to be B–12 active compositions, comprising recovered elaboration products of the fermentation of a vitamin B–12 activity producing strain of Fungi, selected from the class Schizomycetes, namely, Propionibacterium shermanii, with L.L.D. units per milligram well in excess of those specified in the product claims of the patent, but less than the maximum stated in those claims. At the trial, defendants stressed the fact that the microorganism used by them, Propionibacterium shermanii, was not one specifically listed in the '302 patent. But the evidence clearly established that said organism falls within the class of Schizomycetes, which is specifically named in the '302 product claims. Moreover, the Court was not too impressed with the testimony of defendants' microbiologist, Dr. Green, concerning the differences between the B–12 production activity of the two organisms, nor with his explanation of growth capacity under aerobic or anaerobic or "microaerophilic" conditions.

For the reasons stated in this opinion, the Court finds that the single claim of the '794 patent and the three product claims of the '302 patent are valid, and that the same have been infringed by defendants.

As to the relief sought, Merck is entitled to a permanent injunction, enjoining defendants, the officers of the corporate defendants, their agents, servants, employees and attorneys, and those in active concert or participation with them who receive actual notice of the Court's injunction order, by personal service or otherwise, from:

(a) Manufacturing or selling any of defendants' crystalline vitamin B–12 products, as exemplified by exhibits P–28, P–29, P–30 and P–31, or using said pure crystalline vitamin B–12 products in the manufacture of defendants' "Vitamin B–12 Cyanocobalamin Injection USP" material, as exemplified by exhibit P–54, or selling the pure vitamin B–12 component of said injection material, as exemplified by said exhibit P–54;

(b) Manufacturing, selling, or using any other vitamin B–12 product or products, embodying the single claim of the '794 patent;

(c) Manufacturing, selling, or using defendants' liquid concentrate vitamin B–12 active compositions, as exemplified by exhibit P–32, or defendants' feed-grain vitamin B–12 active compositions, as exemplified by exhibits P–33 and P–34, or any other vitamin B–12 active compositions embodying the inventions of the products claims 1, 2 and 3, of the '302 patent;

(d) Otherwise infringing the single claim of the '794 patent or any of the product claims of the '302 patent.

Said injunctive order shall also contain a provision for an accounting against all defendants, damages, and for the allowance of a reasonable counsel fee. With respect to damages, decision as to whether the same shall be increased as permitted by 35 U.S.C.A. § 284, is reserved until after said damages are assessed. Said injunctive order shall also include a provision dismissing defendants' counterclaims challenging the validity of the '794 and '302 patents, and denying the infringement thereof.

This opinion shall constitute findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

Counsel for Merck, on notice to counsel for defendants, will please submit an appropriate order.